## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ROBERT A. DOANE,**<br><br>　　　　　　　　**Plaintiff,**<br><br>　　**v.**<br><br>**QUICKEN LOANS, LLC.,**<br><br>　　　　　　　　**Defendant.** | **Civil Action No.** |

## COMPLAINT
### (With Jury Demand Endorsed Hereon)

Now comes Plaintiff, **ROBERT A. DOANE**, by and through undersigned counsel, and for his Complaint against Defendant **QUICKEN LOANS, LLC.** states and avers as follows:[1]

## INTRODUCTION

Plaintiff, Robert A. Doane brings this complaint against Defendant Quicken Loans, LLC. seeking actual, statutory, and punitive damages for knowing and willful violations of the Telephone Consumer Protection Act, 47 U.S.C. §227, et seq. ("TCPA") and violations of the Massachusetts Consumer Protection Act, G.L. c. 93A, et seq. ("MCPA").   Specifically, as set forth herein, Plaintiff alleges that Quicken Loans, LLC., in order to attempt to illegally generate mortgage sales, commissioned and directed and conspired to direct automated and pre-recorded telemarketing calls to Plaintiff without his consent in violation of the TCPA and MCPA.

---

[1] The allegations herein are made upon information and belief, except the allegations pertaining to Plaintiff, his acts and facts or events within his own personal experience, which are alleged based on his personal knowledge.

## PARTIES

1.      Plaintiff, Robert A. Doane ("Doane" or "Plaintiff"), is, and was at all relevant times, a citizen of the Commonwealth of Massachusetts residing at 21 New Lane, West Tisbury, MA 02568.

2.      Defendant, Quicken Loans, LLC. ("Quicken" or "Defendant"), is a Michigan Limited Liability Company, with its principal place of business located at 1050 Woodward Avenue, Detroit, Michigan 48226.

3.      Plaintiff states upon information and belief that none of the members of Quicken are citizens of the Commonwealth of Massachusetts.

4.      Whenever in this complaint it is alleged that Defendant committed any act or omission, it is meant that Defendant's officers, directors, agents, servants, or employees, subsidiaries, or affiliates committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant or was done in the routine normal course and scope of employment of Defendant's officers, directors, agents, servants, or employees.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S. C. § 1331 as this action involves violations of the TCPA. *Mims v. Arrow Fin. Servs., LLC.*, 132 S. Ct. 740 (2012). This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law cause of action.

6.      This Court has general jurisdiction over Defendant as Defendant engaged in nationwide telemarketing efforts and conduct, including in this District.

7.      This Court has personal jurisdiction over Defendant because Defendant conducts significant business in this District and has continuous and systematic contacts with this District through its telemarketing efforts, including, among other things, that it directed and caused to be made automated calls and calls with prerecorded messages that specifically target consumers in this District.  Further, wrongful conduct giving rise to the claims asserted herein occurred in and was directed to this District.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the wrongful conduct giving rise to this case occurred in and was directed to this District.

## FACTUAL ALLEGATIONS

### A.      Quicken's Operations

9.      At all relevant times, Quicken was a mortgage loan provider.

10.     At all relevant times, in order to solicit sales of mortgage loans, Quicken engaged and conspired with Save Big Leads, Inc. d/b/a Quotelogic.com ("Save Big Leads") and Nicholas G. Passalacqua ("Passalacqua") of Boca Raton, Florida.  As part of this operation, Save Big Leads and Passalacqua utilized overseas telemarketers (the "Telemarketers") to repeatedly, harassingly, deceptively and illegally place at least hundreds of thousands of calls to consumers nationwide, including Massachusetts consumers, utilizing caller-id spoofing (a process that displaces the actual caller identification with a fake local caller identification), robocalls, prerecorded messages and calls using automatic telephone dialing systems ("ATDS").

11.     As a further part of the aforesaid operation, Save Big Leads and Passalacqua falsified email addresses, IP addresses and website data to fraudulently claim that consumers gave consent to be called on their websites, including MinuteMortgageQuotes.com.

12.     At the time that Quicken entered into the aforesaid business relationship with Save Big Leads and Passalacqua, Quicken knew or should have known that Passalacqua, a former soldier in the Bonanno crime family, was a felon who had been indicted and convicted for his role in the Bonanno family's operation of illegal telemarking businesses, extortion and mail and wire fraud.  See *United States of America v. Anthony A. Graziano aka "T.G.", aka "The Little Guy"* et al., Case No. 02-CR-600049-JEM, United States District Court for the Southern District of Florida.

13.     At all relevant times, Quicken knew or should have known of the aforementioned illegal activities of Save Big Leads and Passsalacqua and knew or should have known that Save Big Leads and Passalacqua were fabricating evidence of consent.

14.     At no point has Quicken, Save Big Leads, Passalacqua or the Telemarketers been registered with the Massachusetts Office of Consumer Affairs and Business Regulations (the "Office") as required by 201 C.M.R. § 12.04.

15.     At all times relevant, including but not limited to October, 2017, Quicken authorized the Telemarketers to solicit business on its behalf through use of telemarketing, and Quicken had control over the Telemarketers' actions on its behalf.  For example:

a.     Quicken limited the type of consumers the Telemarketers could solicit.

b.     Quicken restricted the geographical area within which the Telemarketers could solicit business.

c.     Quicken provided the scripts and sales pitches for the Telemarketers.

d.     Quicken instructed the Telemarketers with respect to the volume of telemarketing calls and the methods to be utilized.

e.     Quicken had day-to-day control over the Telemarketers' actions, including the ability to prohibit the Telemarketers from using an ATDS, illegal spoofing and other illegal methods to contact potential customers.

16.     Although Quicken either knew or should have known of the provisions of the TCPA, Quicken, at all relevant times, directed its Telemarketers to generate leads by using methods that violate the substantive provisions of the TCPA.

17.     The calls placed to Plaintiff complained of herein were within the scope of the Telemarketers' job duties and the actual or apparent authority the Defendant provided to the Telemarketers.

18.     At all relevant times, the Defendant profited from the Telemarketers' aforementioned efforts and ratified the actions of the Telemarketers by knowingly accepting the benefits of the Telemarketers' illegal activities.

19.     As a result of Quicken's illegal telemarketing activities, Quicken has received numerous consumer complaints—the majority of which predate the subject unsolicited calls to Plaintiff—including complaints to the Better Business Bureau.

**B.     Illegal and Harassing Calls to Plaintiff**

20.     Plaintiff is an individual who suffers from chronic pain and a sleep disorder, and often sleeps during the day.  Plaintiff is also the trustee of several trusts, and at the time of the illegal calls in question, was the primary caretaker and power of attorney for his two elderly parents, and stepmother suffering from dementia.  In these capacities, Plaintiff was required to keep his cellphone on his person at all times so he could attend to the needs of the trusts and direct the care of his family members.

21.     At all times relevant, Plaintiff's cell phone number, 781-245-6577 ("Cell Phone")—which has been his home number since childhood—has been registered to a "do not call list" maintained by the Federal Trade Commission ("FTC") and the Massachusetts Do Not Call registry as Plaintiff does not wish to be disturbed and harassed by telemarketers.

22.     Plaintiff's family and friends associate Plaintiff with his Cell Phone and Plaintiff's elderly parents, who can easily remember this number, relied on it to contact Plaintiff on daily basis.

23**.**     In the days leading up to October 13, 2017, Plaintiff received, without his prior express written consent, not less than ten telephone calls ("Unsolicited Calls") to his Cell Phone, using "spoofing" and an ATDS, from the Telemarketers.

24.     When Plaintiff would receive the Unsolicited Calls, he would hear a pause and a click before an avatar (prerecorded voice prompt) agent came on the line—facts that evidence of the use of ATDS.

25.     Following these Unsolicited Calls, Plaintiff would attempt to call back the number that appeared on his caller-id.  These attempts were unsuccessful as the numbers that appeared on his caller-id were spoofed and were not working numbers.

26.     Despite Plaintiff's requests that the calls stop, the Telemarketers continued to call incessantly, often waking Plaintiff from his sleep, disrupting his concentration, causing him to lose focus and causing him aggravation and annoyance.

27.     In response to Plaintiff's demands that the calls stop, the caller would merely disconnect and later continue calling.  Plaintiff therefore determined that the only way to get the calls to stop was to express some interest in an attempt to identify those responsible for the calls.

28.     On October 13, 2017, at 3:47 PM, during a very important meeting involving Plaintiff's family and his attorney, a call was received from a number appearing on the caller identification as "781-518-2974," requiring Plaintiff to exit his meeting to answer.  A click and delay were heard (similar to those calls in the past), and then an Avatar came on the line seeking to sell mortgage loans.  The Avatar asked several questions about homeownership, existing mortgages, and Plaintiff's credit.  The questions were answered by Plaintiff.  The Avatar requested consent to be called while on the do-not-call lists using ATDS or prerecorded messages.  Plaintiff thereafter attempted to ask questions to gain more information about the true identity of the caller.  The caller disconnected before providing answers.  Upon attempting to call back, the number was, as were those in the past, determined to be invalid, i.e., spoofed.

29.     Within five minutes after Plaintiff  returned to his meeting, no , Quicken began making unsolicited calls directly to Plaintiff from a number appearing on the caller identification as "508-844-2026," and later using another number shown as "508-844-2009."

30.     On the first of these calls from Quicken, which occurred at 3:52 pm, the agent identified himself as calling from Quicken.  In response, it was made clear that the call was interrupting Plaintiff from his meeting.  The agent, however, insisted on connecting Plaintiff to a "licensed specialist."   Although Plaintiff was in the middle of a meeting, Plaintiff agreed to hear out the alleged specialist in a further attempt to identity the offender and get the incessant calls to stop. The agent then placed Plaintiff on hold, which became too lengthy and at which point the call was disconnected so Plaintiff's meeting could continue.

31.     Unsolicited calls from Quicken thereafter continued.  Specifically, Quicken interrupted Plaintiff with calls that same day, October 13, 2017, at 5:56 pm, and again at 8:09 pm, and then the following day, October 14, 2017, at 10:28 am while Plaintiff was driving, again

at 12:41 pm while Plaintiff was in another meeting, and again at 3:29 pm, waking Plaintiff from sleep.

32.     Following the aforementioned calls, Quicken continued to call Plaintiff, calling again on October 16, 2017, at 10:39 am, 3:46 pm, and 5:59 pm, each time interrupting Plaintiff while he was working on an important and time sensitive matter.  Quicken continued to call again on October 17, 2017, waking Plaintiff up at 10:35 am, and again on that day, from another number, at 3:47 pm, interrupting Plaintiff's late lunch, and yet again at 6:42 pm, interrupting Plaintiff's rest.

33.     At no time was Quicken either directly or indirectly given consent to call Plaintiff's cellphone to solicit sales of mortgage loans, or for any purpose, let alone call Plaintiff using ATDS, spoofed numbers, and prerecorded voice prompts.

### C.     M.G.L. c. 93A demand

34.     On October 18, 2017, Plaintiff sent Quicken a demand letter pursuant to M.G.L. c. 93A, § 9(3) (the "Demand Letter") by priority U.S. mail, demanding Quicken's do-not-call policy, the name of the agents operating on Quicken's behalf, if any, and demanding that the harassing calls immediately stop.  The Demand Letter also demanded actual and statutory damages.

35.     Despite Plaintiff's Demand Letter making a specific request for Quicken's do-not-call policy, Quicken did not provide the requested policy, as required by the TCPA, and, although Quicken acknowledged the Demand Letter, failed to respond to the Demand Letter with a reasonable offer of relief.

36.     Although Quicken failed to adequately respond to Plaintiff's Demand Letter, Quicken did claim in a letter from its attorneys of November 17, 2017 that it had obtained

alleged consent to call Plaintiff "through the website of one of Quicken Loans' **business partners**, MinuteMortgageQuotes.com." (emphasis added).   A true copy of this letter is attached herewith as Exhibit 1 and incorporated by reference.

37.     Plaintiff did not consent to be called by the Telemarketers or Quicken on any website, including but not limited to MinuteMortgageQuotes.com, and in keeping with their scheme, Quicken's "business partners," Save Big Leads and Passalacqua, fraudulently fabricated evidence of alleged consent.

### D.     Plaintiff's Damages

38.     As a direct and proximate result of Defendants' aforementioned illegal telemarketing activities, Plaintiff has suffered actual harm, including but not limited to, invasion of privacy, loss of concentration, loss of productivity, loss of sleep, annoyance, aggravation, emotional distress, diminished value and utility of his cell phone and subscription services, wear and tear to his cell phone, the loss of battery charge and battery life, and per-kilowatt electricity cost required to recharge his cellular telephone as a result of increased usage of his cell phone services.

39.     In addition to the foregoing, as a direct and proximate result of Defendants' aforementioned illegal telemarketing activities, Plaintiff was forced to identify those responsible to try and get the illegal activities to cease, and in the process of doing so incurred expense in time, materials, and use of equipment.

### <u>COUNT I</u>
**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. §227(b)(1)(A))**

40.     The allegations in the preceding paragraphs of this Complaint are realleged and incorporated by reference.

41.     In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing practices.

42.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

43.     The TCPA defines ATDS as "equipment which has the capacity…to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. §227(a)(1).

44.     According to findings of the Federal Communication Commission ("FCC"), the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

45.     The FCC requires prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. In *the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 ¶ 33 (2012).

46.     The FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 92-90, Memorandum and Order, 10 F.C.C. Rcd. 12391, 12397 ¶ 13 (1995).

47.     The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either

section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6574 (2013) ("May 2013 FCC Ruling").

48.     Quicken was legally responsible for ensuring that the Telemarketers complied with the TCPA even if Quicken did not make the calls itself.

49.     Quicken, by and through its agent Telemarketers, violated 47 U.S.C. §227(b)(1)(A)(iii) by placing telemarketing calls to Plaintiff's Cell Phone using an automatic telephone dialing system ("ATDS"), prerecorded messages and spoofed numbers without Plaintiff's prior express written consent.

50.     Pursuant to 47 U.S.C. § 227(b)(3)(B), Quicken is liable to Plaintiff for a minimum of $500 per violation, or not less than $11,000 for the not less than twenty-two (22) violations hereunder.

51.     Pursuant to 47 U.S.C. § 227(b)(3)(C), willful or knowing violations of the TCPA trigger treble damages.

52.     The conduct in violation of 47 U.S.C. §227(b)(1)(A)(iii) was willful and knowing.

53.     Plaintiff is entitled to have his single damages of $11,000.00, trebled to $33,000.00, for the aforesaid willful and knowing violations of the TCPA.

### COUNT II
### (Violations of the Telephone Consumer Protection Act, §227(c)(1) to (4))

54.     The allegations in the preceding paragraphs of this Complaint are realleged and incorporated by reference.

55.     A private right of action exists pursuant to 47 U.S.C. § 227(c)(5) for violations of the regulations promulgated pursuant to the TCPA for the protection of telephone subscriber privacy rights.

56.     47 C.F.R. § 64.1200(c) and (d) sets forth certain procedures with which a telemarketer must comply prior to the initiation of a telemarketing call.

57.     Quicken did directly, and through its agent Telemarketers, violate 47 C.F.R. § 64.1200 *et seq.* in the following respects:

a.     By failing to ensure that Quicken and the Telemarketers maintained a do-not-call list in violation of 47 C.F.R. § 64.1200(d)(1);

b.     By failing to provide Plaintiff, upon his demand, Quicken's and the Telemarketers' do-not-call policy in violation of 47 C.F.R. § 64.1200(d)(1);

c.     By failing to ensure that its personnel and the personnel of the Telemarketers were informed and trained in the existence and use of the do-not-call list in violation of 47 C.F.R. § 64.1200(d)(2);

d.     By failing to provide to Plaintiff the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and the telephone number or address at which the person or entity may be contacted in violation of 47 C.F.R. § 64.1200(d)(4); and

e.     By engaging in and causing a pattern or practice of initiating telephone solicitations to Plaintiff's Cell Phone without Plaintiff's express written consent on at least four (4) occasions in violation of 47 U.S.C. § 64.1200(c)(2).

58.     Pursuant to 47 U.S.C.A. § 227(c)(5) and the regulations promulgated thereunder, Quicken is liable to Plaintiff for a minimum of $500 per violation of the TCPA, for the not less than twenty-two (22) violations hereof.

59.     Quicken's aforesaid conduct in violation of 47 U.S.C.A. § 227(c)(5) and the regulation promulgated thereunder, was willful and knowing.

60.     Plaintiff is entitled under this count to have his single damages ($500 per violation) trebled for these willful and knowing violations.

## COUNT III
### Violations of the Massachusetts Consumer Protection Act, G.L. c. 93A
### And Request for Injunctive Relief

61.     The allegations in the preceding paragraphs of this Complaint are realleged and incorporated by reference.

62.     At all times relevant, Defendant was engaged in trade or commerce within the meaning of M.G.L. c. 93A §2.

63.     940 C.M.R. §3.16(4) provides that an act or practice violates M.G.L. c. 93A, §2 "if it violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other federal consumer protection statutes within the purview of M.G.L. c. 93A, s. 2".

64.     The TCPA was promulgated for the protection of consumers.

65.     940 C.M.R. §3.16(3) provides that an act or practice violates M.G.L. c. 93A, §2 "if it fails to comply with existing statutes, rules, regulations, or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide consumers of this Commonwealth protection."

66.     Quicken's and the Telemarketers' numerous violations of the TCPA (and the regulations promulgated thereunder) constitute unfair and deceptive conduct in violation of M.G.L. c. 93A, §2.

67.     Quicken engaged in unfair and deceptive conduct, by knowingly and willfully contracting with Telemarketers, who Quicken either knew or should have known were unregistered in the Commonwealth of Massachusetts and utilized the aforementioned illegal

practices and methods, in order to attempt to solicit Massachusetts consumers in violation of the TCPA.

68.     Quicken knew or should have known of the requirements and prohibitions of the TCPA (and their underlying regulations) and the applicable provisions of the Massachusetts Privacy Act and Massachusetts common law.  Accordingly, Quicken's violations of M.G.L. c. 93A, §2 were willful and knowing.

69.     Quicken and its agent Telemarketers further engaged in unfair and deceptive conduct by repeatedly violating Plaintiff's right to privacy.

70.     As a direct and proximate result of the aforementioned violations of M.G.L. c. 93A Plaintiff has suffered the harm set forth above and other like and serious harm in an amount to be established at trial.

71.     Plaintiff sent Quicken the Demand Letter, to which Quicken failed to timely respond with a reasonable offer of relief.

72.     As of the filing of this Complaint, Defendant's unlawful conduct in violation of the TCPA and Chapter 93A is continuing.  Said conduct, including the unsolicited, harassing and unlawful calls, as alleged herein, will continue, and will inflict further damage on Plaintiff and other consumers, unless and until this Court, or another court of competent jurisdiction, issues an order directing Defendant to cease and desist from said conduct.

73.     Accordingly, while monetary damages may be sufficient to compensate Plaintiff for past violations, injunctive relief is necessary in order to stop Defendant's unlawful course of conduct from continuing.

**WHEREFORE**, as to all Counts, the Plaintiff requests that this Court:

1.     Enter judgment for Plaintiff and against Defendant;

2.      Award Plaintiff his actual, compensatory, punitive and special damages to be determined at trial;

3.      Find that Defendant to be vicariously liable for the actions and omissions of its agent Telemarketers complained of herein;

4.      Find that Defendant and its agent Telemarketers violated the TCPA, and award Plaintiff statutory damages of not less than $500 for each violation;

5.      Find that Defendant's violations of the TCPA were wilfull, and award Plaintiff statutory damages of not less than $1,500 for each violation;

6.      Find that Defendant and its agent Telemarketers' actions complained of were willful, knowing, intentional, unfair, and deceptive, in violation of M.G.L. c. 93A and award Plaintiff actual, statutory and/or multiple damages;

7.      Award Plaintiff his reasonable costs, expert fees, attorney fees and expenses;

8.      Issue a permanent injunction, enjoining Defendant from additional and continuing violations of the TCPA and Chapter 93A; and

9.      Award Plaintiff pre-judgment interest and such other and further relief as Plaintiff may be entitled at law or in equity.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE.**

Dated: October 13th, 2021

ROBERT A. DOANE

By his attorneys

/s/RICHARD B. REILING
RICHARD B. REILING, ESQ.
BBO # 629203
BOTTONE | REILING
63 Atlantic Ave., 3rd Floor
Boston, MA 02110
Phone:     (617) 412-4291
Facsimile:  (617) 412-4406
Email: richard@bottonereiling.com

And

/s/ DAVID PASTOR
DAVID PASTOR, ESQ.
(BBO# 391000)
PASTOR LAW OFFICE, LLP
63 Atlantic Avenue, 3d Floor
Boston, MA 02110
Telephone: (617) 742-9700
Facsimile: (617) 742-9701
Email: dpastor@pastorlawoffice.com

**Plaintiff's Counsel**

# EXHIBIT 1



W. Kyle Tayman
+1 202 346 4245
KTayman@goodwinlaw.com

Goodwin Procter LLP
901 New York Avenue NW
Washington DC 20001

goodwinlaw.com
+1 202 346 4000

November 17, 2017

**VIA E-MAIL (ROBERTDOANE@RCN.COM)**

Mr. Robert A. Doane
103 Prospect Street
Wakefield, MA  01880

Re:     **October 18, 2017 Demand Letter**

Dear Mr. Doane:

My firm, Goodwin Procter represents Quicken Loans Inc. and serves as its national counsel with respect to claims like yours alleging violations of the Telephone Consumer Protection Act ("TCPA").  In that capacity, Quicken Loans has asked us to respond to your October 18, 2017 pre-suit demand letter ("Letter").  Please direct all future communications concerning this matter or Quicken Loans to my attention.

We have carefully reviewed your letter and the allegations alleged against Quicken Loans.  Based on that review, Quicken Loans will not be making a counter-offer to your demand.  In a good faith effort to avoid unnecessary litigation, I wish to provide you with a summary of our investigation into your allegations so you can understand my client's position.

As you may be aware, Quicken Loans is committed to exceptional client service, which has garnered it 8 consecutive number 1 rankings for client satisfaction in mortgage origination in America from J.D. Power.  In case you are unfamiliar with the process, these rankings are based *solely* on clients' feedback of all the lenders surveyed by J.D. Power – an independent research firm.  Quicken Loans is able to achieve this high accolade year after year because its dedicated (and live) team members respond to all client inquiries with a sense of urgency and enthusiasm.  As the record reflects, that is precisely what happened here.

As we understand your claims, you allege that Quicken Loans violated the TCPA and the Massachusetts Telephone Solicitation Act ("MTSA") by making phone calls to your cellphone despite your number being listed on do-not-call registries.  Quicken Loans' records, however, indicate that it secured prior express written consent to call the number identified in your letter (ending in -6577) on October 13, 2017.  At that time, you (or someone acting on your behalf) requested information about a refinance loan from Quicken Loans (and other lenders) through the website of one of Quicken Loans' business partners, MinuteMortgageQuotes.com.  That request provided, among other things, the first name "Richard," your last name "Doane," the -6577 number, your home address in Wakefield, MA, and

 GOODWIN

November 17, 2017
Page 2

prior express written consent to call the -6577 number. Indeed, in making the request and by voluntarily providing your phone number, you (or whoever was acting on your behalf) were specifically informed that you were requesting and providing consent "to share your information with MinuteMortgageQuotes.com, up to 5 lenders (*potentially including Quicken Loans*) . . . and consent (not required as a condition to purchase a good/service) for them to contact you through automated means (e.g., autodialing, text and pre-recorded messaging) via telephone, mobile device . . . even if it is a cellular phone number . . . and even if your telephone number is currently listed on any state, federal or corporate Do Not Call registry." This prior consent negates any claim that Quicken Loans violated the do-not-call provisions of the TCPA and MTSA, which prohibit calls to numbers listed on the do-not-call registries only *absent* prior consent. *See* 47 C.F.R. § 64.1200(c)(2), (f)(14); M.G.L. c. 159C §§ 1, 3.

You also claim that Quicken Loans placed calls to the -6577 number using "spoofing," a practice you describe as "caus[ing] a fake number to appear on the recipient[']s caller identification so to conceal the identity of the caller or to fool the caller into answering, and in some cases using prerecorded messages." Letter at 2. This allegation is untrue. Quicken Loans does not spoof its numbers. Rather, its systems identify its phone number and its name on caller IDs in compliance with federal and local requirements. Indeed, your allegation that Quicken Loans attempted to hide its identity through spoofing makes no sense in light of your admissions that (1) you were able to determine that the number showing up on your caller ID was "owned and operated by Quicken Loans" (*Id.* at 3), and (2) when you spoke to Quicken Loans' representatives they "identified themselves as Quicken Loans." *Id.* at 2.

Quicken Loans has likewise determined that there is no legitimate factual basis for your claim that Quicken Loans called you on October 13 at 3:47 PM using an avatar. Indeed, you do not allege anything about the call attributable to Quicken Loans. That is not at all surprising because Quicken Loans' records reflect no such call on that day at that time, and the 781-518-2974 number is not one used by the Company. It is also not surprising because Quicken Loans does not (and has not) used prerecorded messages or artificial voices (or avatars) in calls with clients about new purchase or refinance loans.

Pursuant to the request submitted by you (or on your behalf) to Quicken Loans' business partner, and based upon its reasonable and good faith belief that it had prior express written consent to call the subject telephone number, a Quicken Loans team member first placed a call to you at the -6577 number on October 13 at 3:52 PM. Based on this preliminary discussion, Quicken Loans' team members then placed several follow-up calls to you at the -6577 number on October 13, October 14, October 16, October 17, and October 18, 2017.

As you appear to admit in your letter, each of these calls was placed by a live person, and none used prerecorded messages or artificial voices. Moreover, as is apparent from your Letter, Quicken Loans made no attempt to conceal the identity of the callers during any of these calls. Instead, the caller in each instance clearly identified themselves by name and informed you that they were calling on behalf of Quicken Loans. That is because this is Quicken Loans' normal policy and procedure.

 GOODWIN

November 17, 2017
Page 3

You also seem to suggest that Quicken Loans' team members ignored your request that the calls stop and your request for a copy of the Company's do-not-call policy. Letter at 2. As part of its commitment to customer service, Quicken Loans takes these types of requests seriously. As a result, we pulled the call recordings for all of your interactions with Quicken Loans' team members to ensure that they were doing the right thing by honoring your alleged requests. Again, however, our investigation revealed that your allegations lack a factual basis.

As you appear to concede, you did not make a request for Quicken Loans to stop calling during the first call on October 13 at 3:52 PM. Nor did you request a copy of Quicken Loans' do-not-call policy. Instead, during this call, the Quicken Loans team member clearly identified herself as calling from Quicken Loans "regarding the refinance research you're doing." You confirmed that your property was a single family, non-mobile home. You also indicated that you were in a meeting and offered to "try [the team member] back in a little bit." The Quicken Loans team member then asked if she could connect you with a licensed specialist to "set up a better time to talk" and you agreed that she could. While on hold waiting for the specialist, you disconnected the call. In your Letter (at 2), you concede these facts and that you "agreed to hear out the licenses specialist." At no time during this initial call did you contest that you had been looking to refinance or that you consented to receive calls from Quicken Loans. And, consistent with your provision of prior express written consent for the calls, you also did not request to be opted-out of future calls from Quicken Loans.

Against this background, Quicken Loans waited to allow you to complete your meeting before again trying to contact you at the -6577 number. Quicken Loans was able to reach you at approximately 8:09 PM that same day. Again, the Quicken Loans team member clearly identified himself as calling from Quicken Loans in response to your inquiry about refinancing your home mortgage. You again confirmed that your home was a single-family residence, and then indicated that you were traveling and had a bad connection on your phone. The Quicken Loans representative responded by saying: "We'll try you back another time, then." As with your first call, you did not dispute that you had made an inquiry to refinance your mortgage, you did not request to be opted-out from future calls, and you did not request a copy of Quicken Loans' do-not-call policy.

The next conversation between you and Quicken Loans occurred a few days later on October 16, at approximately 12:54 PM. During this call, the Quicken Loans representative (again) clearly identified himself as calling from Quicken Loans. In response, you said you were busy *at the moment* and hung up. You did not indicate that you were not interested in a refinance, you did not request not to be called, and you did not request a copy of the do-not-call-policy.

The final conversation occurred on October 17, at approximately 3:47 PM. As before, the Quicken Loans representative identified himself by name and that he was calling from Quicken Loans about your refinance inquiry for your home in Massachusetts. You confirmed that you owned a single-family home and then said: "I can't talk now, I'm having lunch, alright, thanks," after which you hung up.

In total, between October 13 and October 18, Quicken Loans attempted to call the -6577 number fourteen times (twelve of which are identified in your letter), and was able to connect with you on only



November 17, 2017
Page 4

four occasions.  This shows that your claim (Letter at 2) that Quicken Loans has called you "over the last several weeks" is untrue.

During these calls, you never once made a request that Quicken Loans stop calling or provide you with a copy of the Company's do-not-call policy, as you assert.  Letter at 2-3.  Instead, your Letter was the first such request—in response to that request, I am enclosing a copy of the Company's policy.  As you will see, that policy fully complies with the TCPA.  Quicken Loans, moreover, has not placed any calls to the -6577 number since October 18.  Immediately after receiving your Letter, Quicken Loans put you on its do-not-call list.

Put simply, the factual record reveals that you have no cognizable claim against Quicken Loans under any federal or Massachusetts state law—the TCPA, Telemarketing Sales Rule, Massachusetts Telephone Solicitation Act, Massachusetts Consumer Protection Act, or otherwise.  Instead, Quicken Loans' records confirm that Quicken Loans has numerous meritorious defenses that will foreclose any such claims as a matter of law and fact, not the least of which is that Quicken Loans had consent to call the -6577 number.

As a result, Quicken Loans respectfully rejects your pre-suit demand in its entirety and it will not make any offer of settlement.  If you nonetheless elect to pursue your meritless lawsuit, Quicken Loans will vigorously defend itself and seek affirmative relief with respect to any claims that are pursued against it without the requisite legal and factual basis.  Indeed, the above factual background, coupled with your almost immediate attempt to settle your unidentified "pending lawsuit," raises the specter that the threatened lawsuit is a manufactured one designed solely to extract money from my client without proper legal or factual grounds.  At a minimum, it is apparent that you are misappropriating calls to Quicken Loans that it did not make in an attempt to multiply any possible claims.  Quicken Loans will not pay in response to such a manufactured threat.  Of course, if we are missing something or you wish to explain, we invite you to do so.

Beyond this, as you probably already know, you are not the first person to threaten or file a TCPA action against Quicken Loans.  Over the past several years, Quicken Loans has aggressively and successfully defended itself against each TCPA action brought against it.  In the event you elect to file a complaint, Quicken Loans will employ that same strategy and defend its robust policies, procedures and dialing technology, all of which are TCPA-compliant.  That strategy also includes seeking attorneys' fees and costs for having to defend against lawsuits filed without the requisite legal and factual basis.

Given your threat to file a lawsuit against Quicken Loans, you are hereby given notice to retain and preserve all documents, e-mails, computer and electronic records (including your internet browsing history), and other records and information relevant to this matter.  This includes, without limitation, all documents and electronic records identifying all subscribers and users of the (781) 245-6577 telephone number, all call records for that number, all records concerning the use of that number by you or any other user, and all documents and electronic records identifying each person or entity to whom you or any other user provided the number before and after the October 2017 timeframe in connection with an inquiry or request for information about a home mortgage loan.



November 17, 2017
Page 5

Thank you for your attention to this matter.  We understand that you value your time, and so do
we.  Now that we have clarified the factual record, we hope that you will be able to devote your time to
more worthwhile pursuits than a meritless lawsuit against Quicken Loans.  In the event you are still
interested in refinancing your home loan, Quicken Loans remains committed to customer service and
evaluating whether it can assist you with your refinance needs.

Sincerely,

W. Kyle Tayman